[Civ. No. 17533. Second Dist., Div. Two. June 13, 1950.]

CLYDE J. STOUT, Appellant, v. UNION PACIFIC RAIL-ROAD COMPANY (a Corporation), Respondent.

Hilderbrand, Bills & McLeod, D. W. Brobst for Appellant.

E. E. Bennett, Edward C. Renwick, Malcolm Davis and W. J. Schall for Respondent.

WILSON, J.—Plaintiff, a brakeman employed by defendant in its yards at The Dalles, Oregon, brought this action for personal injuries pursuant to the Federal Employers' Liability Act. (45 U.S.C.A. § 51 et seq.) The action was tried by a jury which rendered a verdict in favor of defendant. Plaintiff has appealed from the judgment entered on the verdict.

The principal question raised on the appeal is whether the evidence is sufficient to sustain the verdict. No citation of authorities is necessary on these propositions: (1) The burden is on plaintiff to prove that he was injured, that defendant was negligent in providing an unsafe appliance and that such negligence was the proximate cause of plaintiff's injury; (2) when it is contended that the judgment is unsupported by the evidence the power of a reviewing court is limited to a determination whether there is any substantial evidence, contradicted or uncontradicted, that will support the judgment; (3) all conflicts in the evidence must be resolved in favor of the prevailing party. A review of the evidence in the instant action demonstrates that it is sufficient to sustain the verdict and the judgment entered thereon.

At the time of the accident plaintiff was engaged as a brakeman in riding on one of a cut of five freight cars for the purpose of controlling their speed and stopping them by means of operating a hand brake on one of the cars. Plaintiff contends the hand brake was defective and inefficient and when plaintiff operated it in the usual manner it failed to slow the movement of the cars and that by reason of his exertion of unusual force in attempting to turn the brake wheel he injured his back, for which he seeks to recover.

The five freight cars had been cut loose from a train and were rolling free onto a siding which had a slight grade in the direction in which the cars were rolling; plaintiff had been instructed to set the brakes and stop the cars when they had rolled clear of the switch; he boarded a box car on which there was installed an Ajax brake of a newer and presumably more efficient type than the brakes on the other cars; the wheel that operated the brakes was located at the end of the car and was about 2 feet in diameter, set parallel with the end of the car; plaintiff stood on a small platform facing the wheel; in order to tighten the brake it was necessary to turn the wheel clockwise; usually the brake can be set with one hand. Plaintiff took hold of a grab iron with his left hand and wound the brake wheel with his right; the cars did not stop and he then used both hands, pulling with all his strength, at which time he testified his back was injured. He stated the cars kept on rolling and he stepped off.

Although the cars were rolling on a slight down grade they stopped within two car lengths after plaintiff alighted. No other member of the crew went near the cars and they did not hit anything which would have served to bring them to a stop. The five box cars weighed about 200 tons unladen and all were loaded. No explanation has been offered for the stopping of the cars and the inference arises that when the brake wheel stopped spinning it tightened the brakes sufficiently to cause them to hold the cut of cars.

Plaintiff testified that there was nothing broken about the brakes as far as he could ascertain; that the "wheel went around all right" when he used one hand; that the only thing that caused him to think the brake was defective was that "it worked a little harder" than he had experienced with other Ajax brakes. Plaintiff never reported to anyone that the brake was defective.

Plaintiff called a medical expert who testified on direct

examination that the X-ray picture of plaintiff's spine showed that the third and fourth lumbar segments had a thin space between them with large bony spurs sticking out, which demonstrates the loss of the cartilage pad between the lumbar vertebrae "with degenerative change that is long standing and has been severe enough to produce this spur formation or calcification in the ligaments." He testified that by "degenerative change" he meant "a wear out change"; that the cartilage pad that acts as a cushion and gives mobility to the segments of the back may become worn out or may be damaged by some specific injury, and as a result the cartilage is partially absorbed and becomes partially replaced with scar tissue, the result of the whole process being a thinning of the disc and the marginal spur growth. The degenerative change, said the witness, that was taking place in plaintiff's back at the time he was injured is due occasionally in some people to specific injuries that have a history but most often it occurs from wear and tear of activity in normal living and work; that it would take two or three years and probably longer to produce the kind of change shown in plaintiff's X-ray.

From the medical testimony the jury had a right to infer that the condition of plaintiff's spine was not due to the unusual force plaintiff claims to have exerted on the brake wheel but was due to the degenerative change described by his medical expert, and from the other evidence the jury might have determined that the brake was not defective.

Plaintiff assigns error in the rulings of the court sustaining defendant's objections to questions propounded to a railroad conductor who had been employed by defendant for 36 years, was familiar with the operation of Ajax brakes and also familiar with the tracks in the railroad yards at The Dalles. Referring to the operation of Ajax brakes, these questions were propounded to the witness:

(1) "Q. What if it is necessary to use two hands? What would you state as far as the condition of the brake is concerned?"

(2) "Would it be operating efficiently and would it be giving the result it is supposed to give if you were required to use two hands?"

(3) "Mr. Mosier, as far as you yourself are concerned, in all the thirty-six years of your experience—and you have been operating those brakes every since they came out, the new Ajax brakes—as far as you are concerned, what does it

indicate to you when you are required to use two hands to stop a cut of cars? Now, that is just as to you.''

To each of these questions defendant objected and the objection was sustained. The court suggested, ''If you will get him to describe the operation and tell what he bases his answer and conclusion on, it might be different.'' It is obvious that the questions were not in proper form to bring out the expert testimony which plaintiff was endeavoring to adduce. The court's suggestion was not adopted. However, the following questions were asked and answers given without objection on the part of defendant:

''Q. Assuming, Mr. Mosier, a cut of cars moving into Track No. 3, five of them in number that are loads, one of the cars being equipped with an Ajax brake, and they are let loose in on that track, and the speed has been estimated all the way from one to five miles an hour, would you please state, Mr. Mosier, how much physical effort was required to bring that cut of cars to a stop until such time as it could be again picked up by the engine and put back on the train from which it was taken. A. Well, an Ajax brake, properly adjusted, should stop those cars on the track. It wouldn't stop them quickly, but it would stop them.

''Q. With how much physical effort? A. Not more than you would exert with one hand.''

The witness was further asked:

''Mr. Mosier, as far as you are concerned, if you have to use two hands to slow up the movement of a cut of cars of that description, would you state what that would indicate as far as the condition of the Ajax brake is concerned?'' Defendant's objection was overruled and the witness answered: ''It possibly wouldn't be in proper adjustment.'' The court remarked, ''That is a conclusion, as to proper adjustment. It doesn't mean anything.''

No motion to strike the answer was made and it therefore stands as evidence in the case. We find no error in the rulings of the court upon the omission or rejection of evidence.

 Plaintiff contends that the court erred in instructing the jury as follows: ''The fact that the defendant has not produced a witness or witnesses in this case is not to be taken by you as an indication that the defendant has no defense to this action or that it concedes to the plaintiff on any of the issues presented to you.'' Plaintiff argues that the instruction invaded the province of the jury denying them the right to

104

draw inferences from the failure of defendant to produce any witnesses. The above quotation, however, is only a part of an entire instruction. Following the language above quoted the instruction reads: "The defendant may, if it desires, rely entirely for its defense upon the evidence produced by the plaintiff. You are to consider the evidence as a whole and if you find in the testimony of the plaintiff or of the witnesses produced by him, evidence favorable to the defendant you shall consider it as such and you may not reject it solely because it originated in the plaintiff's case." The instruction did not intimate to the jurors that they could not draw inferences from the failure of defendant to produce witnesses. They were expressly told that the defendant might, if it desired, rely entirely upon the evidence produced by plaintiff, and that is just what defendant did.

Judgment affirmed.

Moore, P. J., and McComb, J., concurred.